# UNITED STATES DISTRICT COURT
for the

Southern District of Ohio

| | |
|---|---|
| United States of America<br>v.<br><br>Stevie Billups<br>*Defendant(s)* | )<br>)<br>)  Case No. 2:13-MJ-379<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  06/28/2013  in the county of  Franklin  in the
Southern District of  Ohio , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 USC §841(a)(1), 21 USC §841(b)(1)(A)(i), 21 USC §846 and 18 USC §2 | Attempted Distribution of a Kilogram or More of Heroin |
| 18 USC §924(c)(1)(A)(i) and 18 USC §2 | Using or Carrying a Firearm During and in Relation to a Drug Trafficking Crime |

This criminal complaint is based on these facts:
See Attached Affidavit

☒ Continued on the attached sheet.

*Complainant's signature*

SA Tisha Hartsough, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/18/2013

*Judge's signature*

City and state: Columbus, Ohio      N M King, US MJ Judge
*Printed name and title*

## AFFIDAVIT

1. I have been employed by the Federal Bureau of Investigation for 11 years. I am currently assigned to the Columbus Resident Agency, Cincinnati Division and investigate public corruption and civil rights violations. In that capacity I have received extensive training and have much experience regarding those topics. Over the past two years I have specialized in the investigation of corrupt police officers and have worked numerous investigations involving the patterns and techniques used by police officers to commit criminal violations.

2. This affidavit contains information necessary to support a Criminal Complaint against Stevie Billups for the attempted distribution of one or more kilograms of heroin, in violation of 21 USC §841(a)(1), 21 USC §841(b)(1)(A)(i), 21 USC §846 and 18 USC §2, as well as for the use or carrying of a firearm during and in relation to a drug trafficking crime, in violation of 18 USC §924(c)(1)(A)(i) and 18 USC §2. This affidavit is not intended to include each and every fact and matter observed by me or known to the United States.

3. On April 3, 2013, Agents received a phone call from United States Customs and Immigration Enforcement Bulk Currency Task Force (BCTF), who reported that a target of their narcotics investigation had been seen associating with and passing chips to Columbus Division of Police Robbery Detective Stevie Billups at the Hollywood Casino in Columbus, OH.

4. On April 4, 2013, Agents met with BCTF and investigators from the Ohio Casino Control Commission (OCCC) and observed both live and recorded video surveillance footage of Billups in the Casino playing blackjack along side of and receiving chips from the target and/or associates of the target.

5. According to surveillance by the OCCC since March 2013, the vast majority of people with whom Billups has been seen associating in the casino have been identified as having a criminal history, primarily in drug trafficking.

6. In a video recording from on or about March 25, 2013, Billups is observed on camera cashing in chips he had been handed by BCTF's target. Billups then appeared to indicate to the target to meet him in the bathroom.

7. The investigation determined that Billups works as a Columbus Police Officer Tuesday through Saturday, 11am to 7pm. Much of the surveillance of Billups in the Casino occurred during his scheduled work hours. On many occasions, Billups would stay in the casino through the night and into the next morning. Since the OCCC began an investigation into Billups' association with known felons in approximately March 2013, they have conducted surveillance on Billups' actions inside the casino, and occasionally in the casino parking garage where Billups would park his vehicle.

1

8. Casino records show that Billups has been at the Hollywood Casino in Columbus more than one hundred times times since it opened in October 2012, and has bought approximately $101,870.00 worth of chips during that time. Records provided by the OCCC reveal that Billups has lost more money than he has won at the casino.

9. A cursory financial analysis on Billups revealed, among other things, a report filed by a casino in Indiana indicating Billups was trading chips as far back as 2003. Additionally, Billups has filed bankruptcy in the past and is behind in payments on most assets owned by him. Billups also passed a bad check at Scioto Downs Racing Track located in the Southern District of Ohio on or about January 2013.

10. On April 29, 2013, a vehicle registered to and driven by Billups was repossessed. Billups had been observed numerous times at the casino in this vehicle. Investigation revealed Billups may have obtained a title loan on the vehicle at a high interest rate in order to obtain cash. At the time of that repossession, the vehicle contained numerous items related to police work, such as hat badges and a bullet proof vest. The vehicle also contained pay stubs from the City of Columbus in the name of Stevie Billups. Within weeks, Billups was seen driving the vehicle again.

11. On June 17, 2013, the target of the BCTF's narcotics investigation was arrested and interviewed thereafter by Affiant. The target began cooperating with law enforcement and is hereafter referred to in this Affidavit as a Confidential Human Source (CHS).

12. The CHS told Affiant he had met a robbery detective at the Hollywood Casino in Columbus named Steve. He said Steve was aware he is a drug dealer. The CHS said he has asked Steve on at least two occasions to cash in chips for him so that he could avoid reporting by the casino for a transaction in excess of $10,000.00. He said Steve was aware that he was trying to avoid reporting and that he paid Steve a fee of $300.00 to $400.00 each time.

13. The CHS told Affiant that Steve once asked the CHS where he could get some money and the CHS told him he should rob a couple of Mexican drug dealers in his role as a police officer and then the CHS could sell the drugs and they could split the profit. The CHS said Steve laughed and said he was not sure he could do that.

14. The CHS told Affiant that he had recently had discussions with Steve about some money that had been seized from him during a traffic stop. The CHS told Steve if he could help him get the money back he would pay Steve $1,000.00 to $2,000.00. The CHS said he had multiple conversations with Steve about this money and his desire to get it back. Steve continually indicated that he was checking on the money.

15. On the evening of June 27, 2013 into the early morning hours of June 28, 2013, the CHS saw Billups at the casino. The two men again discussed the seized money. The CHS told

2

Billups he really needed the money. At the direction of agents, the CHS indicated to Billups that he was so low on money he was leaving the casino to go meet up with someone to make some money. As he was leaving the casino, the CHS indicated to Billups that he needed to speak with him about something at a later time.

16. During the afternoon hours of June 28, 2013, the CHS placed a consensually monitored phone call to Billups. At the time of the phone call, Billups was still in the casino from the night before. The two men discussed how they were both low on money. Billups asked the CHS if he was going to "get him in the game". The CHS told Affiant this was a saying they would commonly use when they wanted someone else to loan them or give them money with which to gamble. The CHS told the subject he would likely be in the casino later that evening and that he might be able to get Billups in the game.

17. At approximately 8:00pm on June 28, 2012, at the direction of agents, the CHS went into the casino and met up with Billups. The CHS told Billups he had left the casino the night before because he went to "front" someone (indicating he was fronting them narcotics) but that they only gave him half of the money. The CHS told Billups he had to leave the casino shortly to go pick up the rest of the money. The CHS told Billups that if he would follow him to the money pick up and make sure he stayed safe he would pay Billups $2,000.00. The CHS agreed to pay Billups $500.00 up front before the deal and $1,500.00 after the deal once the two men were back at the casino. Billups agreed to provide the CHS protection during the money pick up for the purportedly fronted drugs and asked the CHS if he should bring his gun.

18. At approximately 9:00pm, the CHS and Billups were seen going to their vehicles parked with the valet and in the parking garage, respectively. Billups was observed getting into the trunk of his vehicle and retrieving what appeared to be a hand held radio and a rectangular shaped item that appeared from Affiant's training and experience, to be a handgun in a holster. Billups got into his vehicle and drove to the BP gas station across the street from the casino, which is where he suggested to the CHS the two men meet up so they could go to the money pick up in tandem.

19. After the two men spoke briefly in the BP parking lot, the CHS lead the way to the pre-determined restaurant for the purported money pick up. Billups followed the CHS the entire way and set up in a parking lot adjacent to the restaurant, positioning himself in such a way as to watch the CHS enter and exit the restaurant as well as see the CHS' vehicle. The CHS exited the restaurant and returned to his vehicle. Billups followed the CHS back to the casino and pulled into the valet parking right behind the CHS. Billups could be seen threading a belt through belt loops and buckling it as he exited the car, as if he had just removed a holstered gun from his belt. Investigation has revealed that Billups does not typically carry his firearm into the casino.

20. The CHS and Billups entered the casino and walked directly to a soda machine located near the high limits tables. After getting a drink from the fountain pop machine, the CHS placed a wad of money on the drink station table top and Billups could be seen picking

3

up the wad of money and placing it into his pants pocket. The two men played blackjack together for a brief time and the CHS then left the casino.

21. Over the course of the next few days, Billups called the CHS numerous times on the telephone. In one of the phone calls, Billups told the CHS someone at the casino warned him to watch out for the CHS because he had just caught a case (indicating the CHS had recently been arrested or charged with a crime). Billups told the CHS he wasn't worried and that he trusted the CHS. In one of the other calls, Billups provided the CHS with the name of a friend of his who was an attorney who Billups said could help the CHS get his seized money back.

22. Beginning on Monday, July 15, 2013, into Tuesday, July 16, 2013, the CHS placed calls to Billups' cell phone. Billups did not answer. On the evening of Tuesday, July 16, Billups called the CHS back. Billups asked the CHS if he had contacted the lawyer Billups recommended. Billups said the lawyer might not charge the CHS much money because he was doing Billups a favor. Billups told the CHS to remember him on the back end which indicated to the CHS that he was looking for some money to be kicked back his way if the CHS was able to get his seized money back.

23. During the Tuesday, July 16th phone call between the CHS and Billups, the CHS told Billups he was interested in Billups doing a similar job as he had done for him the previous week. The CHS told Billups the job would be bigger this time and that it would only require about thirty minutes of his time. The CHS said he had someone coming into town who comes twice a month (indicating to Billups he was receiving drugs from a supplier). Billups indicated he was interested but said he would be at work and would have to borrow a car because both of his were broken down. The CHS told Billups he would call him the following day.

24. During the afternoon of Wednesday, July 17, 2013, the CHS placed a call to Billups. Billups said he needed to call the CHS back which he did within five minutes. The CHS indicated he was ready to meet the person he had described to Billups the night before. Billups told the CHS he was at work and would meet the CHS in thirty minutes at the BP where they had met before the first deal on June 28, 2013.

25. Within approximately thirty minutes, Billups arrived on the BP lot and waited for the CHS. The CHS arrived and the two men talked briefly. The CHS explained to Billups that he was to pick up a car loaded with heroin at a nearby apartment complex and drive that car to a hotel around the corner. The CHS told Billups he needed him to follow him to make sure he was safe until he went into the hotel. Billups asked the CHS if he was sure he would be safe at the hotel and asked if the CHS if he wanted him to wait for him until he was back in his car. The CHS told Billups he would be safe at the hotel and that he would be there for sometime as he had to "cut it up" (indicating he had to repackage the heroin). The CHS said he would pay Billups $3,000.00 for this job the next day.

4

26. During this conversation at the BP, Billups tried to coach the CHS into a justification for their actions that afternoon. Billups told the CHS the story should be that the CHS owned Billups money and he was simply following the CHS to collect that money.

27. The CHS and Billups then left the BP parking lot in tandem. Billups followed the CHS to the vehicle purportedly loaded with heroin. The CHS then drove the loaded car to the hotel with Billups behind him the entire way. Billups drove through the hotel parking lot and then positioned himself into an adjacent parking lot so as to get a direct view of the load vehicle and the CHS entering the hotel. Once inside the hotel, the CHS called Billups and told him he was safely inside and Billups could leave. Billups then left the area.

28. Later during the evening of July 17, 2013, Billups called the CHS several times. When the two men spoke, Billups asked the CHS if he could get him some of the money owed to him by the CHS for his work earlier that day. The CHS indicated that getting money that quickly would be difficult, however there would be plenty of money on the following day when he sold the heroin because it was some of the best heroin he had ever gotten.

29. On July 18, 2013, Billups placed a call to the CHS. The CHS did not answer the phone.

30. On the evening of July 18, 2013, the CHS will be directed by agents to call Billups and request to meet him in the casino in order for the CHS to pay Billups the previously agreed upon amount of 3,000.00 for the protection he provided the CHS on July 17, 2013 during the purported heroin deal.

5

Case: 2:13-mj-00379-NMK Doc #: 3 Filed: 07/18/13 Page: 7 of 7 PAGEID #: 9

31. Based on all the facts and circumstances set forth in the preceding paragraphs of this affidavit, Affiant has probable cause to believe that Stevie Billups knowingly aided and abetted the attempted distribution of a kilogram or more of heroin, and carried a firearm during and in relation to the aiding and abetting of a drug trafficking crime. All of the above in violation of 21 USC §841(a)(1), 21 USC §841(b)(1)(A)(i), 21 USC 8§46 and 18 USC §2, as well as 18 USC §924(c)(1)(A)(i) and 18 USC §2.

*[signature]*

Tisha M. Hartsough

Special Agent, Federal Bureau of Investigation


Sworn and subscribed before me this 18th day of July, 2013

*[signature]*

Norah McCann King

United States Magistrate Judge